[Cite as *State v. Stoddard*, 2015-Ohio-3750.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

STATE OF OHIO

    Appellee

v.

DAVID A. STODDARD

    Appellant

C.A. No.     27426

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.    CR 2013 01 0101

DECISION AND JOURNAL ENTRY

Dated: September 16, 2015

WHITMORE, Judge.

{¶1} Defendant-Appellant, David Stoddard, now appeals from his convictions in the Summit County Court of Common Pleas. This Court affirms.

I

{¶2} Jennifer and Jolynn Risten are sisters and Anthony Risten is their brother. During the timeframe relevant to this appeal, all three shared a house located at 261 East Archwood Avenue. The Ristens often had company at their house, including guests who they allowed to reside there on a temporary basis. In early January 2013, Anna K. and David Nelson were temporarily living at the Ristens' house. Anna was a 16-year-old friend of the family who, in January 2013, was about four months pregnant. Nelson was related to the Ristens' younger sister and had grown up with the siblings. While they stayed at the Ristens' house, Anna lived in the attic, and Nelson lived in the basement.

{¶3} Stoddard was Jennifer Risten's boyfriend until late November or early December 2012. There was testimony that the two had a rocky relationship, but that Stoddard had not wanted to end things. According to Jennifer, she ended her relationship with Stoddard because he had anger issues. Nevertheless, they continued to see each other on a social basis. The two had friends in common and, on the evening of January 5, 2013, they planned an outing to Lux Nightclub.

{¶4} Stoddard drove multiple people to Lux Nightclub while another pair of the group's friends drove separately. The group stayed at the nightclub until it closed. Stoddard then agreed to drive home Jolynn and Jennifer, as well as their other friends, Jessica Halman and Tyler Boasko. On the ride back to East Archwood Avenue, however, Stoddard and Halman began to argue. The argument resulted in Halman telling Stoddard to stop the car and getting out. Jennifer joined her outside, and Stoddard left the two women on the side of the road. Shortly thereafter, Jolynn also got out of Stoddard's car. All three women were soon spotted and picked up by the pair of their friends who had driven separately to the nightclub. The group drove back to East Archwood Avenue while Stoddard and Boasko drove back to the place they shared on Cuyahoga Falls Avenue.

{¶5} A man was waiting for Jennifer when she arrived back at home, and the two left in his car. Approximately half an hour later, Stoddard came to the house looking for Jennifer. Both Halman and David Nelson informed Stoddard that he was not welcome there, but Stoddard remained standing at the back doorway and repeatedly asked where Jennifer was. After the third time he asked for Jennifer, Stoddard began rocking back and forth and mumbling to himself. Halman turned to say something to Nelson and, as she began to turn back toward Stoddard, he took a gun from his pocket and shot her in the head. The bullet entered Halman's head on the

side and lodged itself next to her spine. She fell to the ground and was unable to move, but ultimately survived the incident.

{¶6} After Stoddard shot Halman, he fired his gun again in Nelson's direction. Nelson took off running through the kitchen and into the hallway. He turned into the stairwell to head upstairs, but ran into Jolynn and Anna K. Both women had run downstairs when they heard shots being fired and were most of the way down the steps when Nelson ran into them. The three were still standing on the steps when Stoddard reached the stairwell. Stoddard fired his gun twice into the stairwell while yelling at Nelson. One of his shots struck Anna in the head, killing her instantly. As a result of her death, Anna's unborn child also died.

{¶7} After shooting Anna, Stoddard left the Ristens' house and drove to Wadsworth, where he rented a hotel room. The police soon located him and executed an arrest warrant within a few hours of the shooting. Stoddard was in bed when the police entered his hotel room, and they found a loaded .40 caliber handgun under his pillow. Additionally, they found a loaded .32 caliber handgun under the passenger's seat of his car. The police retrieved four .32 caliber shell casings from the Ristens' home and sent the casings and the two guns they found to a laboratory for testing. Ballistics testing later matched the four casings to the .32 caliber handgun that the police found inside Stoddard's car.

{¶8} A grand jury indicted Stoddard on one count of aggravated murder and one count of aggravated felony murder with respect to Anna, involuntary manslaughter with respect to her unborn child, attempted murder with respect to Jessica Halman, attempted murder and felonious

assault with respect to David Nelson, and aggravated burglary. His indictment also contained six firearm specifications and several capital specifications.[1]

{¶9} After a significant amount of motion practice, the matter proceeded to trial. A jury found Stoddard guilty of the attempted murder of Halman and Nelson. It further found him guilty of felonious assault with respect to Nelson. With respect to Anna, the jury found him guilty of aggravated felony murder and the lesser-included offense of reckless homicide. With respect to her unborn child, the jury likewise found him guilty of the lesser-included offense of reckless homicide. Additionally, the jury found Stoddard guilty of aggravated burglary, six firearm specifications, and two capital specifications. Nevertheless, the jury recommended that he receive life in prison without the possibility of parole.

{¶10} The trial court determined that two of Stoddard's counts should merge for purposes of sentencing. Specifically, it determined that: (1) the aggravated felony murder and reckless homicide counts related to Anna should merge; and (2) the felonious assault and attempted murder counts related to Nelson should merge. The court sentenced Stoddard to life in prison without the possibility of parole for the crime of aggravated felony murder. It further sentenced him to an aggregate 38.5-year sentence on his other counts and ordered the foregoing sentence to be served consecutively with his life sentence.

{¶11} Stoddard now appeals from his convictions and raises two assignments of error for our review.

---

[1] Stoddard was also indicted on and later convicted of several other counts and specifications related to a separate incident that occurred in October 2012. Because Stoddard has not appealed from any of the charges that arose as a result of that incident, we do not discuss them in the instant appeal.

II

<u>Assignment of Error Number One</u>

APPELLANT'S CONVICTIONS ARE UNCONSTITUTIONAL AS THEY ARE BASED ON INSUFFICIENT EVIDENCE AND ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE, IN VIOLATION OF THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTIONS 10 AND 16 OF THE OHIO CONSTITUTION.

**{¶12}** In his first assignment of error, Stoddard argues that his aggravated felony murder conviction is based on insufficient evidence and is against the manifest weight of the evidence. Specifically, he argues that the State failed to show that he purposely killed Anna K., as opposed to having recklessly caused her death. We disagree.

**Sufficiency**

**{¶13}** In order to determine whether the evidence before the trial court was sufficient to sustain a conviction, this Court must review the evidence in a light most favorable to the prosecution. *State v. Jenks*, 61 Ohio St.3d 259, 273 (1991).

> An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

*Id.* at paragraph two of the syllabus; *see also State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). "In essence, sufficiency is a test of adequacy." *Thompkins* at 386.

**{¶14}** The aggravated murder statute provides, in relevant part, that "[n]o person shall purposely cause the death of another * * * while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit * * * aggravated burglary * * *." R.C. 2903.01(B). "A person acts purposely when it is the person's specific intention to cause a

6

certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature." R.C. 2901.22(A).

{¶15} Jessica Halman testified that, on the evening of January 5, 2013, she and her friends decided to visit Lux Nightclub in Akron. Stoddard agreed to drive Halman to the club along with Jennifer Risten, Jolynn Risten, and Tyler Boasko. Meanwhile, two of their other friends, Britni Fisher and Jason King, arrived separately in Fisher's car. Halman testified that the group stayed at the club until it closed and then prepared to drive back to 261 East Archwood Avenue, where Jennifer, Jolynn, and their brother Anthony Risten lived. Once again, Stoddard took Halman, Jennifer, Jolynn, and Boasko in his car while Fisher and King drove separately.

{¶16} Halman testified that, as Stoddard was driving, the two of them began to argue about her cousin. According to Halman, Stoddard made several disrespectful remarks and ultimately told her that "he was going to shoot [her] cousin in the head." Halman then told Stoddard to stop the car and got out. Jennifer Risten exited the car along with Halman, and Stoddard left the two of them on the side of the road. They were soon picked up, however, by Fisher and King. Shortly thereafter, the group observed Jolynn Risten walking by herself on the side of the road and picked her up as well. The group then continued on to the Ristens' house on East Archwood Avenue.

{¶17} Halman testified that Jennifer Risten, Fisher, and King left again shortly after the group got back to the house. At that time, several other people were still present at the house, including Jolynn Risten, Anna K., and David Nelson. Both Anna and Nelson were friends of the family who were temporarily living at the house. Halman testified that, as she and Jolynn were sitting in one of the bedrooms, they heard a car pull up to the back of the house. Jolynn

recognized the car as Stoddard's, so Halman went downstairs to lock the back door. Before she could do so, however, a second car pulled up. Halman noted that the second car contained several acquaintances, one of whom was extremely intoxicated. Instead of locking the door, she headed outside and helped the intoxicated girl into the house. Halman stated that Stoddard was walking toward the house as she went outside to help the girl. Once Halman finished bringing the girl inside and handed her to Jolynn, she again made her way to the back door of the house.

{¶18} Halman testified that she found Stoddard standing at the back door speaking with Nelson. Halman believed that the two were preparing to fight, so she stepped in between them and told Stoddard that there was no reason for him to be there. Stoddard inquired as to Jennifer Risten's whereabouts, but Halman told him that Jennifer had left. According to Halman, she accused Stoddard of being disrespectful towards her and her family, but Stoddard only continued to ask where Jennifer was. Halman stated that Stoddard then began "kind of rocking his body and mumbling to himself," so she turned to say something to Nelson. As she turned back toward Stoddard, Stoddard pulled a gun from his pocket and shot her in the head. Halman testified that she spun and fell to the ground. From her position on the ground, Halman heard additional gunshots.

{¶19} Nelson testified that he was living at 261 East Archwood Avenue when the events giving rise to this appeal occurred. On the night in question, Nelson stayed at home while the others went to Lux Nightclub. He testified that, after the group came home from the club, he was in the kitchen washing dishes. At some point, Halman came into the kitchen and told Nelson: "Don't let him in." Although Halman did not mention anyone by name, Nelson understood from her statement that there was a man outside whom she did not want in the house.

He then walked to the back door and saw Stoddard approaching. Once Stoddard reached the door, Nelson told him that he was not welcome inside the house.

{¶20} Nelson testified that he was still standing near the back door with Stoddard when Halman reappeared and pushed him out of the way. She placed herself in between the two men and began talking to Stoddard. Nelson stated that, the next thing he knew, Stoddard removed a gun from his pocket and shot Halman. Nelson saw Halman go down and watched as Stoddard fired the gun again in his direction. Nelson ran from the back door through the kitchen and toward the family room while Stoddard followed. Subsequently, he jumped into the stairwell onto the steps leading to the second floor. Nelson indicated that the stairwell was dark and that he ran into Jolynn and Anna on the steps. At that point, Stoddard approached and began firing into the stairwell. Nelson stated that he and Jolynn were on the same step and Anna was one step above them as Stoddard began firing. Nelson testified that he thought Stoddard's gun eventually "jammed or something" because Stoddard stopped shooting. They then realized that Stoddard had shot Anna. Shortly thereafter, Stoddard left the house.

{¶21} Jolynn testified that Stoddard arrived at the house around the same time as another car, carrying an intoxicated acquaintance. Jolynn took the intoxicated girl from Halman and walked her upstairs. While she was on the second floor, Anna approached her. Jolynn testified that Anna was staying in the attic and came downstairs to look for Britni Fisher. As the two were talking, they heard the sound of two or three gunshots. Jolynn testified that she and Anna began running in the direction of the stairs and ran into Nelson as they approached the bottom of the stairs. Jolynn then saw Stoddard behind Nelson. Stoddard proceeded to fire his gun up the stairs, and Jolynn dropped down on the steps along with Nelson. She testified that

Stoddard fired twice into the stairwell while he was yelling at Nelson. Jolynn stated that, after Stoddard stopped firing and walked away, she realized that he had shot Anna.

{¶22} There was testimony that the police uncovered four .32 caliber shell casings from the house on East Archwood Avenue; two from the area near the back door and kitchen and two from the area near the stairwell. Lieutenant James Phister testified that the police later recovered a .32 caliber handgun from Stoddard's car. Both the casings and the gun were sent to the Bureau of Criminal Identification and Investigation ("BCI") for testing. Andrew Chappell, a BCI forensic scientist specializing in firearm identification, tested the .32 caliber handgun and testified that it was operable. He further testified that he was able match the four casings that the police recovered from 261 East Archwood Avenue to the .32 caliber handgun that they found in Stoddard's car.

{¶23} Martin Lewis, a forensic scientist in BCI's trace evidence section, testified that he analyzed several gunshot residue samples in this matter. Specifically, he analyzed samples that were taken from Stoddard, Anna, Nelson, and Jolynn. Lewis testified that the results for all four samples were highly indicative of gunshot residue. He explained that a person does not need to fire a gun in order to come into contact with gunshot residue. Residue also can be deposited on individuals who are in close proximity to a gun when it is discharged.

{¶24} Stoddard argues that the State failed to prove that he purposely caused Anna's death. According to Stoddard, he never harbored any ill will toward Anna, numerous people acknowledged his long-standing, positive relationship with her, and there was evidence that he was remorseful when he learned that he had shot her. He argues that the stairwell into which he fired his gun was dark, so it was unclear how many individuals were on the steps. He further argues that, while he could have chosen to move in and shoot Nelson at close range in the

stairwell, he did not do so. According to Stoddard, his actions in shooting into the dark stairwell were more consistent with his trying to scare people, such that his actions were, at best, reckless. He argues that there was no evidence that he ever intended to kill Anna or anyone else in the stairwell.

**{¶25}** The majority of Stoddard's arguments sound in weight, not sufficiency. Because this portion of his assignment of error only concerns the sufficiency of the evidence, the persuasiveness of the State's evidence is not at issue. *See State v. Brooks*, 9th Dist. Summit No. 23237, 2007-Ohio-1424, ¶ 7 ("[S]ufficiency tests the burden of production while manifest weight tests the burden of persuasion."). We need only decide whether, viewing the evidence in a light most favorable to the State, a rational trier of fact could have found that the State proved beyond a reasonable doubt that Stoddard purposely caused Anna's death. *See Jenks*, 61 Ohio St.3d 259, at paragraph two of the syllabus.

**{¶26}** To prove that Stoddard acted purposely, the State was not required to show that he specifically intended to kill Anna when he discharged his gun. That is because "[t]he doctrine of transferred intent is firmly rooted in Ohio law." *State v. Sowell*, 39 Ohio St.3d 322, 332 (1988). The doctrine applies with equal force to the crimes of aggravated murder and aggravated felony murder. *See State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, ¶ 171. *Accord State v. Richey*, 64 Ohio St.3d 353, 363-364 (1992), *abrogated on other grounds*, *State v. McGuire*, 80 Ohio St.3d 390, 402-403 (1997). It stands for the proposition that "the culpability of a scheme designed to implement the calculated decision to kill is not altered by the fact that the scheme is directed at someone other than the actual victim." *State v. Solomon*, 66 Ohio St.2d 214, 218 (1981). Thus, under the doctrine of transferred intent, the State only had to prove that Stoddard

purposely tried to cause the death of another person and, in acting upon that purpose, caused the death of Anna.

{¶27} Viewing the evidence in a light most favorable to the State, we must conclude that the State set forth evidence from which a rational trier of fact could have concluded that Stoddard purposely caused Anna's death. *See Jenks* at paragraph two of the syllabus. There was evidence that, right before he shot Anna, Stoddard had a confrontation with Halman and Nelson. Both Halman and Nelson told Stoddard that he was not welcome at the house and attempted to get him to leave. Rather than leave, Stoddard pulled a gun from his pocket and shot Halman in the head at close range. He then fired his gun again in Nelson's direction and chased him through the kitchen and into the area of the stairwell. There was evidence that, once he arrived at the stairwell, Stoddard fired his gun twice more into the stairwell where Nelson had just fled. Although the stairwell was dark, the space was a relatively small one and there was evidence that Stoddard was standing so close that the shots he fired left gunshot residue on all three of the people present in the stairwell. Based on all the evidence, the jury reasonably could have concluded that Stoddard fired into the stairwell with the intention of shooting Nelson, but instead shot and killed Anna. Thus, under the doctrine of transferred intent, the jury reasonably could have concluded that Stoddard purposely caused Anna's death. *See Powell* at ¶ 171. Stoddard's argument to the contrary lacks merit.

**Manifest Weight**

{¶28} In determining whether a conviction is against the manifest weight of the evidence an appellate court:

> must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest

miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). Weight of the evidence concerns whether a greater amount of credible evidence supports one side of the issue than supports the other. *Thompkins*, 78 Ohio St.3d at 387. Further, when reversing a conviction on the basis that the conviction was against the manifest weight of the evidence, "the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *Id.*, quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). Therefore, the Court's "discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Browning*, 9th Dist. Summit No. 26687, 2013-Ohio-2787, ¶ 14, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

**{¶29}** Jennifer Risten testified that she and Stoddard were in a relationship until sometime around the end of November 2012. Although the two were no longer dating in January 2013, they continued to see one another on a social basis. Jennifer testified that she, Stoddard, and the rest of their group left Lux Nightclub after it closed at 2:30 a.m. on January 6, 2013. On the ride home, Stoddard and Halman began fighting about Halman's cousin, and Halman ultimately decided to get out of the car. Jennifer exited the car with Halman, and the two remained on the side of the road until two more of their friends picked them up. After driving a short distance, the group spotted Jennifer's sister, Jolynn, walking on the side of the road and picked her up as well. They then drove back to the Ristens' house on East Archwood Avenue.

**{¶30}** Jennifer confirmed that she left her house with a male friend almost as soon as she got home. She testified that Stoddard was not welcome at her house after she left. After she

learned about the shooting, Jennifer discovered that Stoddard had recorded two voicemail messages on her phone. In the first message, left at 4:13 a.m., Stoddard stated:

> Say, listen. I want you to understand that it's only a matter of time before the same thing happens to you, okay? Okay, well I'm outie, all right? Like, I'm never going to be found, okay? But I want you to understand that I loved you to death, and you've brought this upon your people, okay? All right. You really made a bad mistake. Like, you shoulda listened to me. You really shoulda listened to me. So, bye now. I love you. Bye.

In the second message, left at 4:28 a.m., Stoddard once again told Jennifer that he loved her. Jennifer testified that she ended her relationship with Stoddard because he had anger issues. She stated that he was known to have guns and confirmed that he had fired his gun at the walls inside her house on a previous occasion.

{¶31} Tyler Boasko testified that he lived with Stoddard at the time of this incident and rode with him to Lux Nightclub. He testified that an argument between Stoddard and Halman on the ride home led to Halman and the Risten sisters exiting Stoddard's car. Stoddard then drove Boasko back to their place on Cuyahoga Falls Avenue instead of the Ristens' house on East Archwood Avenue. According to Boasko, Stoddard told him that he was going to bed when they got home, so they said goodnight to one another and went to bed. Boasko soon fell asleep and did not see Stoddard again that night. He testified that, as far as he knew, Stoddard and Jennifer Risten had parted on good terms that evening. He admitted, however, that Stoddard was not happy about Jennifer's decision to start seeing another man. Boasko agreed that Stoddard was trying to work things out with Jennifer.

{¶32} Jason King testified that, when he and his girlfriend Britni Fisher brought Halman and the Risten sisters back to the house on East Archwood Avenue, a man was waiting there to pick up Jennifer Risten. King agreed that Jennifer and Stoddard were experiencing a rough patch in their relationship at the time these events occurred. He testified that the two had been fighting

during the weeks leading up to the shooting incident and that the night in question "would have been the first night that [Stoddard] would have gotten to stay with [Jennifer] in weeks." According to King, Stoddard had been "pretty excited" at the thought of going back to East Archwood Avenue and spending time with Jennifer.

{¶33} Lieutenant Phister testified that he used cell phone towers to triangulate the position of Stoddard's cell phone after the shooting. His investigation led the police to a location in Wadsworth, where officials were able to spot Stoddard's car in the parking lot of the Legacy Inn. Officer Andrew Blubaugh helped to execute an arrest warrant for Stoddard at the Legacy Inn. He testified that the records for the room showed that Stoddard checked in at 4:25 a.m. on the morning of January 6, 2013. When the police entered Stoddard's room, they found him on one of the beds, where he had been sleeping. Officer Blubaugh testified that Stoddard had a loaded .40 caliber handgun under his pillow in the hotel room. Additionally, the police found the .32 caliber handgun that he had used in the shooting underneath the passenger's seat of his car.

{¶34} Stoddard did not testify in his own defense or present any witnesses. Nevertheless, he argues that several points he elicited on cross-examination demonstrate that the jury lost its way in convicting him. First, multiple witnesses testified that Stoddard got along well with Anna and that the two referred to each other as cousins even though they were not. Stoddard points the foregoing as evidence that he bore no ill will toward Anna and never meant to shoot her. Second, there was testimony that, immediately after the shooting, Stoddard tried to relinquish control of his weapon to either Nelson or Jolynn. Nelson testified that, after Stoddard stopped firing, he turned his gun on himself and asked Nelson to shoot him. Meanwhile, Jolynn testified that Stoddard tried to hand her his gun while repeatedly stating, "Tell Jen I love her." Stoddard portrays his attempts to relinquish his gun as remorse over killing Anna and argues

that, had he wanted to kill her, he would not have reacted that way. He argues that the jury lost its way in choosing to believe that he intended to kill someone when he shot into an unlit stairwell. According to Stoddard, his actions in shooting into the dark stairwell were more consistent with his trying to scare people.

{¶35} Having reviewed the record, we cannot conclude that the jury lost its way when it found that Stoddard purposely caused Anna's death. The jury heard testimony that, directly before shooting Anna, Stoddard shot Halman in the head at close range. It further heard testimony that he then chased Nelson through the house into the stairwell and fired twice while yelling at him. Although there was testimony that Stoddard attempted to relinquish his gun after the shooting, the jury was free to reject the argument that he did so out of remorse. The jury heard the voicemail messages that Stoddard left for Jennifer Risten shortly after the shooting. In his message, Stoddard essentially blamed Jennifer for what had happened, telling her that she had made a "bad mistake" and had "brought this upon [her] people." While there was testimony that Stoddard generally got along with Anna, the State did not have to prove that he specifically intended for her to die when he caused her death. Under the doctrine of transferred intent, the jury could convict Stoddard of aggravated felony murder so long as it found that he fired his gun for the purpose of killing another person. *See Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, at ¶ 171. There is evidence to that effect in the record, as the jury could have chosen to believe that Stoddard fired his gun for the purpose of shooting Nelson.

{¶36} We have carefully reviewed the record and cannot say that this is the exceptional case where the evidence weighs heavily against the conviction. *See Browning*, 2013-Ohio-2787, at ¶ 14, quoting *Martin*, 20 Ohio App.3d at 175. As such, we must conclude that the jury did not

lose its way by convicting Stoddard of aggravated felony murder. Stoddard's first assignment of error is overruled.

<u>Assignment of Error Number Two</u>

APPELLANT'S CONSECUTIVE SENTENCES ARE IN VIOLATION OF SECTION 2941.25 OF THE OHIO REVISED CODE, AS OUTLINED IN <u>STATE V. JOHNSON</u>, AND THE DOUBLE JEOPARDY CLAUSES OF THE OHIO AND UNITED STATES CONSTITUTIONS.

**{¶37}** In his second assignment of error, Stoddard argues that the trial court erred by sentencing him to allied offenses of similar import. Specifically, he argues that: (1) the two counts for the aggravated felony murder of Anna K. and the reckless homicide of her unborn child should have merged; and (2) the two counts for the attempted murder of Nelson and the aggravated felony murder of Anna should have merged. We do not agree.

**{¶38}** "Whether multiple punishments imposed in the same proceeding are permissible is a question of legislative intent." *State v. Washington*, 137 Ohio St.3d 427, 2013-Ohio-4982, ¶ 10. "Absent a more specific legislative statement, R.C. 2941.25 is the primary indication of the General Assembly's intent to prohibit or allow multiple punishments for two or more offenses resulting from the same conduct." *Id.* at ¶ 11. "R.C. 2941.25(B) sets forth three categories in which there can be multiple punishments: (1) offenses that are dissimilar in import, (2) offenses similar in import but committed separately, and (3) offenses similar in import but committed with separate animus." *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, ¶ 20. With regard to the first category, "two or more offenses of dissimilar import exist * * * when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable." *Id.* at ¶ 26. "It is the defendant's burden to establish his or her entitlement to the protections of Section 2941.25." *State v. Dembie*, 9th Dist. Lorain No. 14CA010527, 2015-Ohio-2888, ¶ 8.

{¶39}  First, Stoddard argues that the trial court erred by not merging his convictions for the aggravated felony murder of Anna and the reckless homicide of her unborn child.  He argues that Anna's unborn child died directly as a result of her passing, such that a single gunshot killed them both.  Because both deaths "were the result of one singular act," Stoddard argues that the separate counts for each death should have merged.

{¶40}  The Supreme Court has held that crimes are of dissimilar import, and therefore not subject to merger, if they "involv[e] separate victims or if the harm that results from each offense is separate and identifiable." *Ruff* at ¶ 26.  Stoddard was convicted of aggravated felony murder for purposely causing Anna's death while committing, or while fleeing after immediately having committed, an aggravated robbery.  R.C. 2903.01(B).  He was convicted of reckless homicide for recklessly causing the "unlawful termination of [Anna's] pregnancy."  R.C. 2903.041(A).  Although both deaths resulted from a single shot, Stoddard's crimes were of dissimilar import.  That is because they involved separate victims and the harm that resulted from each of the offenses was separate and identifiable.  *See Ruff* at ¶ 26.  *See also State v. Wright*, 1st Dist. Hamilton No. C-080437, 2009-Ohio-5474, ¶ 62 (felonious assault of mother and resulting murder of her unborn child were crimes of dissimilar import not subject to merger); *State v. Jones*, 18 Ohio St.3d 116, 118 (1985) (two counts of aggravated vehicular homicide were crimes of dissimilar import where two victims were passengers in the same car).  Thus, the trial court did not err by refusing to merge Stoddard's convictions for aggravated felony murder and reckless homicide.

{¶41}  Next, Stoddard argues that the trial court erred when it failed to merge his convictions for the attempted murder of Nelson and the aggravated felony murder of Anna.  He

once again argues that, because both charges stemmed from the same conduct, i.e., his firing into the stairwell, they should have been treated as allied offenses.

{¶42} Initially, we note that Stoddard never argued before the trial court that his counts for the attempted murder of Nelson and the aggravated felony murder of Anna should merge. "An accused's failure to raise the issue of allied offenses of similar import in the trial court forfeits all but plain error, and a forfeited error is not reversible error unless it affected the outcome of the proceeding and reversal is necessary to correct a manifest miscarriage of justice." *State v. Rogers*, ___ Ohio St.3d ___, 2015-Ohio-2459, ¶ 3. An appellant bears the burden of demonstrating that a trial court committed plain error by sentencing him to allied offenses of similar import. *See id.* at ¶ 22-23.

{¶43} Stoddard has not shown that the trial court committed plain error when it sentenced him on both of the foregoing counts. Stoddard fired two shots into the stairwell where Nelson and Anna were standing. One bullet struck Anna, and the second easily could have struck Nelson. "[W]hen [a] defendant's conduct put[s] more than one individual at risk, that conduct [can] support multiple convictions because the offenses were of dissimilar import." *Id.* at ¶ 27, quoting *Ruff*, 2015-Ohio-995, at ¶ 23. Accordingly, the trial court did not commit plain error when it sentenced Stoddard for both the attempted murder of Nelson and the aggravated felony murder of Anna. Stoddard's second assignment of error is overruled.

III

{¶44} Stoddard's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

—

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

BETH WHITMORE
FOR THE COURT

HENSAL, P. J.
SCHAFER, J.
CONCUR.

APPEARANCES:

ADAM VAN HO, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN DIMARTINO, Assistant Prosecuting Attorney, for Appellee.