[Cite as *State v. Hopkins*, 2018-Ohio-1864.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| *Plaintiff-Appellee* | : | Appellate Case No. 27131 |
| | : | |
| v. | : | Trial Court Case No. 2015-CR-121 |
| | : | |
| TANNER D. HOPKINS | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| *Defendant-Appellant* | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 11th day of May, 2018.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by MEAGAN D. WOODALL, Atty. Reg. No. 0093466, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellee

ALAN GABEL, Atty. Reg. No. 0025034, P.O. Box 1423, Dayton, Ohio 45401
        Attorney for Defendant-Appellant

. . . . . . . . . . . . .

TUCKER, J.

{¶ 1} Defendant-appellant Tanner Hopkins appeals from his conviction for murder, involuntary manslaughter, reckless homicide, felonious assault and having weapons while under disability. For the reasons outlined below, we affirm.

## I. Facts and Procedural History

{¶ 2} This case arises from the January 13, 2015 assault suffered by Chaenin Taylor. At the time of the assault, Taylor was seven-months pregnant. As a result of the assault, the fetus died.

{¶ 3} Following an investigation, Hopkins was indicted on one count of murder (purposeful) in violation of R.C. 2903.02(A), one count of involuntary manslaughter in violation of R.C. 2903.04(A), one count of reckless homicide in violation of R.C. 2903.041(A), one count of felonious assault (serious harm) in violation of R.C. 2903.11(A)(1), and two counts of having weapons while under disability in violation of R.C. 2923.13(A)(2). The charges of murder, involuntary manslaughter and felonious assault each carried attendant repeat violent offender specifications in violation of R.C. 2941.14 and 2941.149. Hopkins entered a plea of not guilty by reason of insanity. Following an evaluation, the trial court found Hopkins competent to stand trial, and the plea was withdrawn.

{¶ 4} Hopkins filed a notice of alibi in which he asserted that Roderick Daniels would appear as a witness and testify that he and Hopkins had been out driving around the city at the time of the assault. Thereafter, the State filed a request seeking leave to introduce evidence of a prior bad act under Evid.R. 404(B). Specifically, the State sought

to introduce evidence that Hopkins had previously assaulted Taylor. Hopkins filed a response in opposition. By entry dated March 22, 2016, the trial court granted the State's motion. Hopkins also filed a motion to try the two counts of having weapons while under disability to the court. The motion was granted.

{¶ 5} A jury trial began on April 4, 2016. During trial, Taylor testified that she and Hopkins had been dating when she became pregnant in June 2014. She testified that Hopkins initially had no problems with the pregnancy, but that he later began to claim that he was not the father of the baby. She testified that Hopkins expressed that he did not want the baby, and that he wanted her to undergo an abortion. She testified that he was angry with her because she would not undergo an abortion. Taylor testified that on December 4, 2014, she was on her way to a bus stop to go to work at approximately 5:00 a.m., when Hopkins approached and assaulted her in an empty field nearby. She testified that he kicked her on her side and hit her in the face. She testified that she then went to the hospital.

{¶ 6} Records from Good Samaritan Hospital were introduced by the State. The records indicate that Taylor presented to the emergency department where she informed medical personnel that she had been assaulted by her boyfriend. She related that he had been arguing with her because he wanted paperwork regarding the pregnancy. She informed the treating physician that she had been kicked once in the upper abdomen, and that her face had been hit multiple times. The records indicate that Taylor had swelling and bruising on her face, bruising on her back, a cut lip, and red marks on her neck. Testing did not reveal any problems with the pregnancy.

{¶ 7} Immediately after the identification of the records, the trial court gave the jury

an appropriate limiting instruction regarding the use of the prior act evidence. The instruction was repeated at the end of the trial.

{¶ 8} Following the December 2014 incident, Taylor stopped contact with Hopkins, and she and her aunt created a safety action plan. Taylor testified that in the event she felt she was in danger, she would text her aunt that she was on her way to the hospital. The plan also provided that she would keep her aunt updated on her location.

{¶ 9} Taylor testified that on January 13, 2015, Hopkins called her and stated that he wanted her to come to his home to talk about the baby. She testified that he sounded calm during the phone conversation. Hopkins resided with his mother, Deborah Crawford, on Edison Street in Dayton. Taylor testified that when she arrived at the house, she was met by Hopkins' mother. Taylor testified that she went to Hopkins' bedroom where she and Hopkins talked about the baby. She testified that Hopkins was playing a video game and that he appeared calm. Taylor testified that Hopkins' mother informed them that she was leaving the residence. Taylor and Hopkins then had sex.

{¶ 10} Taylor testified that she texted her aunt at approximately 5:36 p.m. that she was going to the hospital. She testified that she did so because Hopkins began acting "funny." Tr. p. 306. She testified that she went to the bathroom, and that Hopkins went to the bathroom after her. She testified that at some point afterward, she was leaning down to put on her shoes when Hopkins grabbed her by the hair and pulled her to the floor. According to Taylor, Hopkins kicked her repeatedly and also hit her. At one point, he pinned her to the wall and continued to kick and punch. She tried to protect her abdomen, but Hopkins kicked and hit her in the abdomen. Taylor testified that while he was attacking her, Hopkins stated, "fuck you bitch. I hope you and that baby both die."

Tr. p. 295. He also stated that she and the baby "would never make it out [of the house]." Tr. p. 296. Following the attack, Hopkins left the bedroom. Taylor testified that she remembers leaving the house and leaning on the gate outside the home. She testified that the next thing she remembers is a lady asking her name. According to Taylor, she does not remember anything else until she woke up in the hospital and learned that her baby had died. She testified that she has a scar from the Caesarean section performed to remove the fetus, as well as scars from where tubes were inserted into her body during the hospitalization. She further testified that she had to undergo an emergency hysterectomy as well as another surgery to remove her gallbladder.

{¶ 11} The State presented the testimony of Waltina Ellington who testified that she was driving home from work on January 13, 2015 when she observed people standing in the road on Decker Avenue. She then observed a woman lying in the middle of the street. Ellington testified that she got out of her car and approached the woman. According to Ellington, the woman was distressed, crying and "spitting up." Tr. p. 367. Ellington asked the woman what was wrong, and the woman replied that she was pregnant and her "boyfriend, Devon, kicked her in the stomach."[1] *Id.* She testified that another woman attempted to lift the injured woman to put her into a car due to the cold, but that the woman began to scream. Ellington testified that they left her on the ground and waited for help to arrive.

{¶ 12} The State also presented the testimony of Jama Perry who stated that she was on her way home from work around 7:00 p.m. on January 13, 2015 when she observed a person lying in the middle of the intersection of Decker Avenue and Edison

---

[1] The record indicates that Taylor often referred to Hopkins by his middle name of Devon.

Street. She testified that the woman was distraught, crying and asking for help. According to Perry, the woman stated that her "baby daddy kicked her in her stomach." Tr. p. 353. Perry testified that the woman was coughing and vomiting, and that she said she thought she was dying. Perry called 911 and remained with the woman.

{¶ 13} Dayton Fire Department EMT Amy Dunkin also testified. She testified that she responded to the intersection of Edison Street and Decker Avenue at approximately 7:00 p.m. where she found a woman in the middle of the intersection. She testified that it was cold and dark, and that the patient had on a coat and one shoe. Dunkin stated that the woman was very upset and crying, and that she kept repeating that she was dying and to save her baby. Dunkin testified that she asked the woman what had happened, and that the woman responded that she had been kicked and punched by her "baby's daddy, Devon." Tr. p. 437. She testified that it was necessary to learn how the injuries occurred because it played a part in determining whether an entire trauma team should be assembled and waiting at the hospital. Dunkin noted there was an "8 to 9-inch flat spot on the belly that it just looked like it had been kind of collapsed and her belly had pushed in." Tr. p. 434.

{¶ 14} Dayton Fire Department Paramedic Richard Caudill testified that when they got Taylor into the ambulance he began to cut off her clothing. He asked her what happened and she stated that she had been "stomped; she'd been punched on; she'd been slammed to the ground." Tr. p. 417. He testified that he observed "a lot of severe bruising in her abdomen to the point, where, * * * the one imprint almost looked like a shoe imprint." Tr. p. 418. Caudill testified that Taylor had minor bruising to her chest, and major bruising on her arms. He testified that one arm was swollen to three times the

normal size. He testified that Taylor was at the point that he thought she might die. Caudill testified that he observed emergency room staff intubate Taylor. He testified that he observed that there was no fetal heartbeat. He last observed Taylor as she was being taken to surgery. He testified that she was in the emergency department for approximately fifteen minutes before she was removed to the surgical department.

{¶ 15} Lee Lehman, Chief Deputy Coroner for Montgomery County, testified that he performed an autopsy upon the fetus. He testified that he found signs of trauma, blood clots, hemorrhaging and tears to the placenta. He further found two separate skull fractures. Lehman testified that the fetus died from significant blunt force trauma. He further noted that an examination of the fetal heart revealed a minor defect that could have caused a heart murmur, but that the defect could have healed on its own.

{¶ 16} Dayton Police Department Detectives Chad Jones and Melissa Schloss both testified that they conducted a search of the Crawford residence. Schloss testified that she recovered a handgun found in a dresser in Hopkins' bedroom. Jones testified that he was lying on the floor, using a flashlight, to search under Hopkins' bed. He testified that he was able to observe something under there but could not determine what it was. He testified that he had to stretch his arm to reach the object which was later identified as Taylor's cellular telephone.

{¶ 17} The jury rendered a guilty verdict on the charges of murder, involuntary manslaughter, reckless homicide and felonious assault. The trial court found Hopkins guilty of both charges of having a weapon while under disability. The trial court found that the State had proven the repeat violent offender specifications, as the evidence showed that Hopkins had prior convictions for felonious assault and aggravated assault.

{¶ 18} On April 12, 2016, Hopkins filed a pro se motion to withdraw the jury verdict. In the motion, he alleged that he recognized a juror as someone with whom he had an "intimate past." The motion further alleged that he informed both of his defense attorneys before closing argument and that they informed him it was too late to raise the issue. The motion finally argued that because of his prior sexual contact with the juror, he was denied the right to an impartial jury.

{¶ 19} The trial court appointed new counsel to represent Hopkins in relation to the motion, and a hearing was conducted on April 19, 2016.[2] Hopkins testified that he recognized a female juror as someone he had sex with one time in 2012. He testified that she had come to his home with a friend of Hopkins' to do some business. He testified that after his friend left, he and the woman had sex.

{¶ 20} Hopkins testified that he was discussing the jurors in a room with both his counsel when he informed them about the matter. He stated that his attorneys "brushed [him] off." Tr. p. 731. Hopkins testified that when they returned to the courtroom and he saw the juror was still there, he told counsel that "she's gotta go," but that they again "brushed [him] off." Tr. p. 733. He testified that while meeting with appointed counsel to prepare for this hearing, he had used a blank jury seating chart to indicate where the juror was seated. He described the juror as a blond woman in her 30's.[3] He testified that he did not know the juror's name, only that her nickname was "TT."

{¶ 21} On cross-examination, the State asked the name of the friend who brought

---

[2] For purposes of clarity, counsel appointed for the post-trial hearing on the motion to withdraw the jury verdict will be referred to as appointed counsel.

[3] The location on the chart was determined to correspond to juror number 10 who was a woman in her 50's.

the woman to Hopkins' home. Hopkins testified that he only knew the man as "Mike," and that they "did business." When asked what type of business, Hopkins was evasive until the trial court ordered him to answer the question. At that point, Hopkins stated that he sold "stuff" to Mike. He initially would not answer questions regarding what the "stuff" consisted of, only to say that it was not drugs. He eventually stated that it was "extra TVs and stuff, game systems and stuff I was selling."

{¶ 22} Both of the trial attorneys testified with Hopkins waiving the attorney/client privilege with regard to this sole issue. Both lawyers testified that Hopkins did not inform them of any sexual relationship with a juror. Following the hearing, the trial court entered a decision and entry denying the motion upon a finding that Hopkins' testimony differed from the allegations in his motion and that the clear and credible evidence supported a finding that he did not raise the issue with counsel.

{¶ 23} A sentencing hearing was held on April 28, 2016, during which the trial court merged the counts for involuntary manslaughter and reckless homicide with the count of murder. The State elected to proceed with sentencing on the murder count for which the trial court imposed a sentence of 15 years to life. The trial court imposed an 8-year sentence for the felonious assault and ordered it to run consecutively to the sentence for murder. The court merged the two counts of having weapons under disability, imposed a sentence of 36 months thereon, and ordered the sentence to run concurrently with the murder and felonious assault counts. The trial court imposed ten-year sentences for each of the two repeat violent offender specifications and ordered them to run consecutively to each other and consecutively to the murder and felonious assault counts. Hopkins was sentenced to an aggregate prison term of 43 years to life.

{¶ 24} Finally, the record shows that, following the sentencing hearing, the trial court stated that it found, based upon the conviction for which he had just been sentenced, that Hopkins had committed the instant offense while on community control in Case No. 2013-CR-2931. The trial court imposed a sentence therefore.

{¶ 25} Hopkins filed an appeal.[4]

## II. Prior Bad Act Evidence

{¶ 26} The first assignment of error asserted by Hopkins states:

THE TRIAL COURT ERRED IN PERMITTING EVIDENCE OF PRIOR BAD ACTS.

{¶ 27} Hopkins argues that the trial court abused its discretion in admitting evidence of "other bad acts" because it violated Evid.R. 404(B). The trial court, over Hopkins' objection, permitted the State to present evidence at trial of the prior instance of violence perpetrated by Hopkins against Taylor in December 2014.

{¶ 28} Evid.R. 404(B) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." In determining whether such evidence is admissible, the Supreme Court of the United States has set forth several factors for courts to examine: "(1) the other crimes evidence must have a proper purpose, (2) the proffered evidence must be relevant, (3)

---

[4] Hopkins did not include the probation revocation sentence in 2013-CR-2931 in this appeal.

its probative value must outweigh its potential for unfair prejudice, and (4) the court must charge the jury to consider the other crimes evidence only for the limited purpose for which it is admitted." *State v. Gus*, 8th Dist. Cuyahoga No. 85591, 2005-Ohio-6717, ¶ 18, citing *Huddleston v. United States*, 485 U.S. 681, 691, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988). The admission of prior-bad-acts evidence under Evid.R. 404(B) "lies within the broad discretion of the trial court, and a reviewing court should not disturb evidentiary decisions in the absence of an abuse of discretion that has created material prejudice." *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, ¶ 66.

{¶ 29} The State argues that the evidence of the prior assault was relevant to prove identity because it rebutted Hopkins' notice of alibi. The State further argues that it was relevant to the issue of motive and intent.

{¶ 30} We note that Hopkins withdrew his notice of alibi prior to trial. Further, there was no issue regarding identity as Taylor clearly identified Hopkins as her assailant. Thus, we disagree with the State's claim that the prior assault was relevant to the issue of identity.

{¶ 31} However, we conclude that the evidence was nonetheless admissible. Hopkins was convicted of murder in violation of R.C. 2903.02(A) which states that "[n]o person shall purposely cause the death of another or the unlawful termination of another's pregnancy." The evidence that Hopkins stated that he did not want the child, along with the fact that he had previously kicked Taylor in the abdomen when she was six-months pregnant, is relevant to motive and purpose to end the pregnancy. We cannot say that the trial court abused its discretion by concluding that the probative value of the evidence outweighed its potential for unfair prejudice, especially in light of the fact that the jury was

properly instructed on the use of the evidence.

{¶ 32} We conclude that the trial court did not abuse its discretion in admitting evidence of the prior assault. Accordingly, the first assignment of error is overruled.

### III. Admission of Hearsay Evidence

{¶ 33} Hopkins' second assignment of error is as follows:

THE TRIAL COURT ERRED IN PERMITTING HEARSAY EVIDENCE.

{¶ 34} Hopkins contends that the trial court erred by permitting Ellington, Perry and Dunkin to testify regarding Taylor's statements made when they encountered her in the street because the statements constitute hearsay evidence. He further argues that the statements cannot be considered as excited utterances because there was no testimony establishing that the assault and the statements were made contemporaneously.

{¶ 35} Evid.R. 801(C) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Hearsay is not admissible. Evid.R. 802. However, Evid.R. 803 sets forth exceptions to the rule. Evid.R. 803(2) provides that an excited utterance is not excluded by the hearsay rule.

{¶ 36} An "excited utterance" is defined as "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Evid.R. 803(2). In order for an alleged excited utterance to be admissible, four prerequisites must be satisfied: (1) a startling event produced a nervous excitement in the declarant, (2) the statement was made while still under the stress of excitement caused by the event, (3) the statement relates to the startling event,

and (4) the declarant personally observed the startling event. *State v. Brown*, 112 Ohio App.3d 583, 601, 679 N.E.2d 361 (12th Dist. 1996). "The excited utterance exception to the hearsay rule exists because excited utterances are the product of reactive rather than reflective thinking and, thus, are believed inherently reliable." *State v. Ducey*, 10th Dist. Franklin No. 03AP–944, 2004-Ohio-3833, ¶ 17.

{¶ 37} While the passage of time between the event and the declaration is relevant, it is not dispositive of the issue. *State v. Taylor*, 66 Ohio St.3d 295, 303, 612 N.E.2d 316 (1993). An excited utterance need not be strictly contemporaneous with the startling event. *State v. Duncan*, 53 Ohio St.2d 215, 220, 373 N.E.2d 1234 (1978). But the statement must be made while the declarant is still under stress from the event. *Ducey*, at ¶ 22. "Relevant factors in ascertaining whether the declarant was in a sufficient state of excitement or stress include outward indicia of [the declarant's] emotional state such as tone of voice, accompanying actions, and general demeanor." *Id.*, quoting *Osborne v. Kroger Co.*, 10th Dist. Franklin No. 02AP–1422, 2003-Ohio-4368, ¶ 46.

{¶ 38} The record indicates that Taylor texted her aunt at 5:36 p.m. before the attack occurred. She was discovered in the street at 7:00 pm. At some point in between these two times, Hopkins attacked her and left the room. Taylor remembers sitting against the wall when he left. She has no recollection of what she did other than give Hopkins' dog some food she found in the bedroom in order to keep it quiet while she left, and then leaving the house. There is no evidence regarding the length of the attack, or how long she remained in the room before leaving the house. It is clear from the record that she was having trouble walking and remembering the details of what occurred after

the attack.

{¶ 39} We cannot conclude that there was such a lengthy period of time as to automatically mandate exclusion of the statements. Given Taylor's physical and emotional condition at the time aid was rendered, it is reasonable to conclude that she was still in a state of stress at the time she made the statements.[5] There was evidence that Taylor was crying, distraught, vomiting, and in pain. She was lying in the middle of the street in the cold with only one shoe. Her statements were made in response to questions about what happened, and evinced a reasonable fear that she was going to die. According to the EMTs, they questioned Taylor about what happened in order to assess her condition and decide on a treatment plan.

{¶ 40} Based upon this record, we conclude that the circumstances allowed the trial court to find that Taylor's statements constituted an excited utterance and that they were, thus, admissible as a hearsay exception. Therefore, Hopkins' second assignment of error is overruled.

## IV. Merger

{¶ 41} Hopkins' third assignment of error states:

THE TRIAL COURT ERRED IN IMPOSING CONSECUTIVE SENTENCES

RATHER THAN MERGING COUNTS 1 AND 4.

{¶ 42} The murder count charged that Hopkins purposely caused the unlawful termination of another's pregnancy. The felonious assault count charged that he

---

[5] Indeed, an argument could be made that Taylor's statements constituted a dying declaration or statements made for the purpose of medical diagnosis and treatment.

knowingly caused serious physical harm to Taylor. Hopkins contends that it is possible to commit both offenses with the same conduct because it necessarily follows that a person who causes the termination of a pregnancy will cause serious physical harm to the mother of the child.

{¶ 43} R.C. 2941.25, Ohio's allied offense statute, provides:

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

{¶ 44} "When determining whether two offenses are allied offenses of similar import subject to [the] merger [statute], the conduct of the accused must be considered." *State v. Johnson*, 128 Ohio St.3d 153, 2010–Ohio–6314, 942 N.E.2d 1061, syllabus. The Supreme Court of Ohio explained its holding in *Johnson* by articulating the following three-part test:

A trial court and the reviewing court on appeal when considering whether there are allied offenses that merge into a single conviction under R.C. 2941.25(A) must first take into account the conduct of the defendant. In other words, how were the offenses committed? If any of the following is

true, the offenses cannot merge and the defendant may be convicted and sentenced for multiple offenses: (1) the offenses are dissimilar in import or significance—in other words, each offense caused separate, identifiable harm, (2) the offenses were committed separately, or (3) the offenses were committed with separate animus or motivation.

State v. Ruff, 143 Ohio St.3d 114, 2015–Ohio–995, 34 N.E.3d 892, ¶ 25.

{¶ 45} } We review the trial court's allied-offense determination de novo. State v. Williams, 134 Ohio St.3d 482, 2012-Ohio-5699, 983 N.E.2d 1245, ¶ 28.

{¶ 46} This court has stated, in accord with Ruff, that when offenses involve separate victims or the resulting harm from each offense is separate and identifiable, they are of dissimilar import or significance. State v. Wells, 2015-Ohio-3511, 41 N.E.3d 216, ¶ 15 (2d Dist.). Other courts have applied this concept directly to cases involving pregnant women. See State v. Wright, 1st Dist. Hamilton No. C–080437, 2009-Ohio-5474, ¶ 62 (felonious assault of mother and resulting murder of her unborn child were crimes of dissimilar import not subject to merger); State v. Stoddard, 2015-Ohio-3750, 42 N.E.3d 264, ¶ 40 (9th Dist.), appeal not allowed, 144 Ohio St.3d 1506, 2016-Ohio-652, 45 N.E.3d 1050 (although caused by a single gunshot, crimes of aggravated felonious murder of mother and resulting reckless homicide of her unborn child were offenses of dissimilar import); State v. Studgions, 8th Dist. Cuyahoga No. 103546, 2016-Ohio-5236, ¶ 16 (defendant's conduct in kicking and punching his pregnant girlfriend was directed at two separate victims; the girlfriend and her unborn child).

{¶ 47} The definition of person includes an unborn human who is viable. R.C. 2901.01(B)(1)(a)(ii). Viability is defined as "the stage of development of a human fetus

at which there is a realistic possibility of maintaining and nourishing of a life outside the womb with or without temporary artificial life-sustaining support." R.C. 2901.01(B)(1)(c)(ii). Hopkins has not contested viability.

{¶ 48} It is clear that there are two separate victims under the law in this case. Further, the harm caused to each is separate and identifiable. Taylor's unborn baby was killed. Taylor suffered major injuries, two of which required surgery.

{¶ 49} Based upon the foregoing, we conclude that the trial court did not err in sentencing. Hopkins' third assignment of error is overruled.

## V. Ineffective Assistance of Counsel

{¶ 50} Hopkins' fourth assignment of error states:

DEFENSE COUNSEL DEPRIVED APPELLANT OF HIS CONSTITUTIONAL RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL AND A FAIR TRIAL.

{¶ 51} In this assignment of error, Hopkins contends that trial counsel did not provide effective assistance. Specifically, Hopkins contends that trial counsel made an improper statement in the presence of the jury. Hopkins further contends that trial counsel rendered ineffective assistance by failing to object to (1) improper statements made by the prosecutor during opening statement and closing argument; (2) Taylor's testimony regarding her injuries; (3) the introduction of the prior assault against Taylor; (4) the testimony of Caudill; and (5) the introduction of letters received by Taylor. He also claims that appointed counsel for the post-trial hearing was ineffective with regard to the hearing on the motion to withdraw the jury verdict.

{¶ 52} Claims of ineffective assistance of trial counsel are reviewed under the two-part test enunciated in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and adopted by the Supreme Court of Ohio in *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989). To reverse a conviction based on ineffective assistance of counsel, it must be demonstrated that trial counsel's conduct fell below an objective standard of reasonableness and that his errors were serious enough to create a reasonable probability that, but for the errors, the result of the trial would have been different. *Bradley* at 142. "Hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time, and a debatable decision concerning trial strategy cannot form the basis of a finding of ineffective assistance of counsel." *State v. Mitchell*, 2d Dist. Montgomery No. 21957, 2008-Ohio-493, ¶ 31. Trial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance. *Strickland*, 466 U.S. at 688. When evaluating an ineffective assistance of counsel claim, "[j]udicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689. A reviewing court may not second-guess decisions of counsel which can be considered matters of trial strategy. *State v. Hartman*, 2016-Ohio-2883, 64 N.E.3d 519, ¶ 45 (2d Dist.).

{¶ 53} We begin with the claim that trial counsel made an inappropriate comment during trial when he stated, "[y]eah, I think so unless I get fired." Hopkins argues that the comment was prejudicial because "it suggested to the jury that even Defense Counsel is against his client and/or they are not getting along which implies a negative and harmful disposition of the Appellant." We find this argument lacks merit as the comment was made at a sidebar, outside the hearing of the jury.

{¶ 54} We next turn to the issue of the juror with whom Hopkins claimed to have had a sexual relationship. Hopkins argues that appointed counsel was ineffective because he failed to subpoena the female juror to testify at the hearing on the motion and because he failed to advise Hopkins of his right to refuse to waive attorney/client privilege.

{¶ 55} We reject the claim that Hopkins was not advised that he did not have to waive his privilege. While it is clear from the record that appointed counsel discussed the waiver issue with Hopkins, that conversation is not a part of the record before us. Thus, we cannot determine whether the right to refuse to waive was specifically discussed. However, we note that appointed counsel did state, on the record, that he informed Hopkins that he could not make trial counsel testify unless Hopkins waived the privilege. Further, the trial court also asked Hopkins whether he wanted to waive the privilege in order to permit the testimony of trial counsel. Hopkins stated on the record that he wanted to waive. Based upon this record, we cannot say that appointed counsel was ineffective.

{¶ 56} With regard to the failure to have the juror testify at the hearing, Hopkins does not claim that appointed counsel failed to investigate or contact the female juror to discuss the matter. He merely claims that appointed counsel should have called her to testify. The decision not to call the juror may have been a strategic decision. The record indicates that during voir dire, the trial court had the parties introduce themselves. Defense counsel had Hopkins stand for the jury during his introduction. The trial court then asked the entire pool whether anyone knew any of the individuals who had been introduced. No jurors indicated that they knew Hopkins. At no time during the remainder of the voir dire, or even during the trial, did any juror indicate that they knew

Hopkins. Therefore, it is possible that the juror would not have provided the desired testimony. Thus, we cannot say that counsel was ineffective.

{¶ 57} We next address the failure of trial counsel to make objections during the opening statement and closing argument of the State. All of these statements are also raised in Part VII, below, in conjunction with Hopkins' claim of prosecutorial misconduct. As stated in that assignment of error, we find only one of the statements improper, but we also conclude that it did not did not rise to the level of misconduct. The statement we found improper, that the fetus felt pain, is one that trial counsel may have made a strategic decision to forego an objection to in order to avoid drawing further attention to the claim.

{¶ 58} Next, Hopkins claims counsel was ineffective for failing to object when Taylor testified about the injuries she suffered. Hopkins' claim is not persuasive. He initially frames the argument in the context of the admission of hearsay by claiming that Taylor's testimony regarding the seriousness of her injuries constitutes hearsay. However, upon further reading, we note that his argument is actually one of sufficiency because it centers on the claim that Taylor's testimony, without corroborating expert medical testimony, was not sufficient to prove the element of serious physical harm. In other words, he conflates hearsay with sufficiency. Either way, we find this argument lacking in merit.

{¶ 59} Taylor testified that she has scars from several surgeries as well as from tubes inserted into her body. She further testified that she is aware she was in a coma because she did not awaken in the hospital until days after the assault. Hopkins contends that this testimony constitutes improper hearsay. We cannot agree. Hopkins cites no case law, nor have we found any, indicating that a victim is not competent to

testify to the injuries they have suffered nor the surgeries they underwent as a result of those injuries.

{¶ 60} Further, even without Taylor's testimony, we would find sufficient evidence to support the conviction for felonious assault. In order to prove a violation of R.C. 2903.11(A), the State was required to prove that Hopkins caused "serious physical harm" to Taylor. As defined under R.C. 2901.01(A)(5), "serious physical harm" means any of the following:

* * *

(b) Any physical harm that carries a substantial risk of death;

(c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;

(d) Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement;

(e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain.

{¶ 61} Courts have upheld a finding of serious physical harm where a victim's injuries necessitated medical treatment. *See State v. Davis*, 8th Dist. Cuyahoga No. 81170, 2002-Ohio-7068, ¶ 20; *State v. Drew*, 10th Dist. Franklin No. 07AP-467, 2008-Ohio-2797, ¶ 61. The evidence demonstrates that EMTs transported Taylor to the hospital. Caudill testified that, based upon his training and experience, he believed Taylor was going to die. The State also presented pictures of Taylor in the hospital. The pictures depict what can only be described as massive bruising to Taylor's arm, with

one arm visibly swollen. The pictures also depict bruising to the palms of her hands as well as both legs. There are also pictures showing Taylor in a hospital bed with a breathing tube. Taylor's aunt, who was present at the hospital, testified that the pictures were accurate depictions of Taylor following the assault. Caudill also testified that he observed Taylor being intubated.

{¶ 62} Further, this court has stated that a 5-day hospitalization is competent evidence of a temporary substantial incapacity sufficient to prove serious physical harm. *State v. Winston*, 71 Ohio App. 3d 154, 160, 593 N.E.2d 308 (2d Dist. 1991). The State presented competent evidence that Taylor was hospitalized for ten days. Thus, we conclude that the State presented sufficient, competent evidence to prove the element of serious physical harm regardless of the lack of expert testimony.

{¶ 63} Hopkins next argues that trial counsel rendered ineffective assistance by failing to object to the introduction of evidence regarding the December 2014 prior assault. However, he admits that counsel objected thereto "only before the trial." The record shows that counsel renewed the objection during Taylor's testimony. Thus, we find this argument lacks merit.

{¶ 64} Likewise, we reject Hopkins' argument that trial counsel was ineffective for failing to object to the State's introduction of letters allegedly written by Hopkins and mailed to Taylor. Counsel did object to the letters and the trial court ruled that they were not admissible. Further, the letters were not published to the jury.

{¶ 65} Finally, Hopkins contends that trial counsel should have objected when the paramedic, Richard Caudill, testified, "[t]o me she was at the point they're going to die. They are literally going to die and are getting off whatever on their chest they feel they

need to get off before they die." Hopkins contends that there was no foundation for this statement and that it constitutes hearsay. However, Caudill testified as to his experience and training in dealing with individuals who are severely injured. He was in the process of describing Taylor's physical status, as well as the statements she was making while he attempted to assess her. Thus, we conclude that there was a basis for the testimony. And we find no basis for concluding that this testimony constitutes hearsay. Further, counsel may have decided not to object simply because it would draw more attention to the statement.

{¶ 66} We conclude that Hopkins has failed to demonstrate ineffective assistance of counsel. The fourth assignment of error is overruled.

### VI. Weapons Under Disability

{¶ 67} The fifth assignment of error asserted by Hopkins provides:

THE TRIAL COURT ERRED IN CONVICTING APPELLANT OF HAVING WEAPONS UNDER DISABILITY WHEN THE OPERABILITY OF THE WEAPON WAS NOT SUFFICIENTLY PROVED.

{¶ 68} Hopkins argues that the State did not present evidence sufficient to prove that the firearm recovered pursuant to the search warrant was his or that it was operable.

{¶ 69} When a defendant challenges the sufficiency of the evidence, the defendant is arguing that the State presented inadequate evidence on an element of the offense to sustain the verdict as a matter of law. *State v. Hawn*, 138 Ohio App.3d 449, 471, 741 N.E.2d 594 (2d Dist.2000). "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at

trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.*

{¶ 70} Hopkins was convicted of having a weapon under disability in violation of R.C. 2923.13(A)(2). That statute provides, in relevant part, that "no person shall knowingly acquire, have, carry, or use any firearm * * * if * * * [t]he person is under indictment for or has been convicted of any felony offense of violence * * *." To "have" a firearm within the meaning of R.C. 2923.13(A), a person must have actual or constructive possession of it. *State v. Davis*, 8th Dist. Cuyahoga No. 104221, 2016-Ohio-7964, ¶ 13, citing *State v. Adams*, 8th Dist. Cuyahoga No. 93513, 2010-Ohio-4478, ¶ 19. There was no argument that Hopkins had actual possession of the firearm recovered from the bedroom dresser. Accordingly, the trial court had to decide whether Hopkins had constructive possession of the gun.

{¶ 71} "Constructive possession exists when an individual exercises dominion and control over an object, even though that object may not be within his or her immediate physical possession." *State v. Wolery*, 46 Ohio St.2d 316, 329, 348 N.E.2d 351 (1976). A defendant's exercise of dominion and control over the area where a firearm is found supports an inference that the defendant possessed the firearm. *State v. Pitts*, 4th Dist. Scioto No. 99 CA 2675, 2000 WL 1678020, *9 (Nov. 6, 2000), citing *State v. Williams*, 10th Dist. Franklin No. 97APA02-255, 1997 WL 606877, * 3 (Sept. 30, 1997).

{¶ 72} In this case, the evidence supports a finding that Hopkins constructively

possessed the gun. Dayton Police Detective Melissa Schloss executed a search warrant obtained for the residence. She testified at trial that during the search of the bedroom identified as belonging to Hopkins, she found a firearm located in a drawer of a dresser. Further, Taylor provided testimony identifying the bedroom in which the gun was found as Hopkins's bedroom. The State introduced photographic evidence of the room with Taylor testifying that items seen in the photographs – including clothes, shoes, a flat screen television and a dog cage – belonged to Hopkins.

{¶ 73} We next address Hopkins' assertion that the State failed to prove that the gun was operable. He appears to base this argument, in part, upon the fact that the gun was not loaded. However, R.C. 2923.11(B)(1) defines a firearm as "any deadly weapon capable of expelling or propelling one or more projectiles by the action of an explosive or combustible propellant [, including] an unloaded firearm, and any firearm that is inoperable but that can readily be rendered operable." Further, the State presented Timothy Duerr, a firearms and tool mark examiner with the Miami Valley Regional Crime Laboratory, who testified that the gun, which he was able to load and shoot, was operable.

{¶ 74} Finally, the State demonstrated, through the testimony of Dayton Police Department Detective Nathan Via, that Hopkins had a 2009 conviction for felonious assault, a second degree felony, and a 2013 conviction for aggravated assault, a fourth degree felony.

{¶ 75} Based upon this record, we conclude that the State presented evidence sufficient to support the conviction for having weapons under disability. Accordingly, the fifth assignment of error is overruled.

## VII. Prosecutorial Misconduct

{¶ 76} The sixth assignment of error is as follows:

APPELLANT WAS DEPRIVED OF HIS RIGHT TO A FAIR TRIAL THROUGH PROSECUTORIAL MISCONDUCT.

{¶ 77} Hopkins alleges numerous instances of prosecutorial misconduct. Many of his arguments relate to comments made by the prosecutor during the opening statement and closing argument. Others allege the introduction of improper evidence. We will address each of these arguments in turn.

{¶ 78} We begin with the alleged improper evidence, and note that "[t]he conduct of a prosecuting attorney during trial cannot be made a ground of error unless the conduct deprives defendant of a fair trial." *State v. Maurer*, 15 Ohio St.3d 239, 266, 473 N.E.2d 768 (1984). Hopkins first claims that the prosecutor acted improperly by introducing evidence of the December 2014 assault at the bus stop. As stated in Part II, above, we found that the evidence of the prior assault was admissible and probative to the issue of motive and intent. Thus, we reject this claim of misconduct.

{¶ 79} Hopkins next objects to the following testimony of Paramedic Richard Caudill who testified as follows: "To me she was at the point they're going to die. They are literally going to die and are getting off whatever on their chest they feel they need to get off before they die." He contends that there was no foundation for this testimony. However, in the cited passage, Caudill indicated that he and his partner were examining Taylor in order to assess her condition. The prosecutor then asked Caudill to describe Taylor's physical state. At that point, Caudill made the above statement. We cannot conclude that the prosecutor improperly elicited this statement based upon the question

asked.   We find no prosecutorial misconduct.

{¶ 80} Finally, Hopkins contends that the prosecutor acted improperly by introducing two letters purportedly written by him to Taylor.   We find this claim without merit as the letters were not admitted nor published to the jury.

{¶ 81} We next turn to statements made by the prosecutor during the opening statement and closing argument.   The test for prosecutorial misconduct is whether the remarks were improper and, if so, whether they prejudicially affected any substantial right of the accused.     *State v. Hanna*, 95 Ohio St.3d 285, 2002-Ohio-2221, 767 N.E.2d 678, ¶ 61, citing *State v. Jones*, 90 Ohio St.3d 403, 420, 739 N.E.2d 300 (2000).   "However, the touchstone of analysis 'is the fairness of the trial, not the culpability of the prosecutor.' "   *Id.*, citing *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982). This court has recognized prosecutors are given wide latitude in their closing statements to draw inferences from the testimony heard and the evidence presented, but, of course, they do not have complete and total freedom.   *State v. Lillicrap*, 2d Dist. Montgomery No. 23958, 2011-Ohio-3505, ¶ 6. "In reviewing allegations of prosecutorial misconduct, we review the alleged wrongful conduct in the context of the entire trial," and if "it is clear beyond a reasonable doubt that a jury would have found the defendant guilty even absent the alleged misconduct, the defendant has not been prejudiced and his conviction will not be reversed."   *State v. Underwood*, 2d Dist. Montgomery No. 24186, 2011-Ohio-5418, ¶ 21. *See also State v. Hall*, 2d Dist. Montgomery No. 25794, 2014-Ohio-2094, ¶ 19.

{¶ 82} We next note that defense counsel did not raise an objection to any of the claimed improper statements made by the prosecutor during either opening statement or closing argument.   Thus, we are limited to a review for plain error.   This court has

previously stressed "we recognize plain error 'with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.' In order to prevail on a claim governed by the plain error standard, [the defendant] must demonstrate that the outcome of [his] trial would clearly have been different but for the errors that [he] alleges." (Internal citations omitted) *State v. Carpenter*, 116 Ohio App.3d 615, 621, 688 N.E.2d 1090 (2d Dist. 1996).

{¶ 83} Hopkins objects to the prosecutor's initial opening statement language which is as follows:

I hope you and that fucking baby die. Those are his words. That is what he said as he stopped [sic], kicked, and body slammed the mother of his child, Chaenin Taylor.

{¶ 84} Hopkins claims that it is unclear whether there was any evidence to support the claim that he made such a statement. However, we note that Taylor testified that, as he was attacking her, Hopkins stated, "[f]uck you, bitch. I hope you and that baby both die." While the prosecutor's words were not an exact replication of the testimony, they were essentially identical to the testimony of the victim. There was no embellishment and the statement was based upon the evidence. We cannot conclude that this constitutes prosecutorial misconduct.

{¶ 85} Hopkins next turns to the prosecutor's closing argument. He first contends that the prosecutor acted improperly by stating, "[w]ell he got his wish. His baby's dead. And he came so close in the second part of that but, thankfully, Chaenin lived. Ladies and gentlemen, you heard the harrowing account from Chaenin Taylor and what he did to her." We find no misconduct. The State presented evidence that Hopkins had made

statements indicating his hope that both the fetus and Taylor would die. The State merely reiterated this evidence. Further, we find no misconduct in characterizing the events as harrowing.

{¶ 86} He next alleges that the prosecutor stated, "Count 1 purposeful murder. There is no dispute about that." He contends that by making this statement, the prosecutor "usurp[ed] the jury's function, as the issue is disputed and it is up to the jury to decide that – not the State of Ohio." We conclude that this is a misstatement of the record. Instead, the prosecutor stated, "[s]tarting with Count I which is murder, purposeful. On or about January 13th of 2015. That is an essential element of each and every charge. There's no dispute about that. Every person * * * that testified told you that this happened on January 13th, 2015." We disagree with Hopkins' claim that the prosecutor was arguing that there was no dispute that Hopkins committed purposeful murder. Instead, from a reading of the entire passage, it is clear that the prosecutor was informing the jury that the date of the assault is not in dispute. We find no misconduct.

{¶ 87} Hopkins next claims that the prosecutor made the following improper comment: "Chaenin told you she was planning a shower. She told you that she had named her London. She was healthy."[6] Actually, Hopkins again omitted portions of the prosecutor's statement. A reading of the entire passage shows that the prosecutor was discussing the element of "unlawful termination of the pregnancy" which is necessary to the conviction for murder in violation of R.C. 2903.02(A). In conjunction with that, the

---

[6] Hopkins asserts that the claim that the baby was healthy is belied by the testimony of the coroner who found a heart defect during the autopsy. However, the coroner specifically testified that the defect was minor, would not result in death, was easily correctable, and could have mended itself prior to birth.

prosecutor was arguing that Taylor's future plans regarding the baby showed that she did not want to terminate the pregnancy. We cannot say that this constitutes misconduct.

**{¶ 88}** Hopkins next contends that the prosecutor improperly stated, "* * * carries a substantial risk of death. Ooh. We certainly have that. She was in a coma. Coded almost died." He claims that this constitutes impermissible hearsay because there was no medical testimony. In the cited passage, the prosecutor was discussing the serious physical harm element of felonious assault and the definitions of serious physical harm, including physical harm that carries a substantial risk of death. The statements were supported by the testimony at trial. Specifically, Taylor's aunt testified that she was present in the hospital with Taylor. She testified about her observations of the events in the hospital. Caudill also testified that he believed that Taylor was dying when he assessed her status. In short, this portion of the prosecutor's closing argument does not depict misconduct.

**{¶ 89}** Hopkins next objects to the following cited statements by the prosecutor:

We're at the point, ladies and gentlemen, where you now know what happened to Chaenin Taylor. * * * It is to the point where there is no one else in this world that could've done this to her except that man sitting right there. The man that's been sitting in front of you the whole week.

[W]e are confident that you're going to have no choice but to find him guilty of each and every count.

Hold Tanner Hopkins responsible for what he did to this lady.

**{¶ 90}** We note, upon review, that Hopkins has, once again, omitted portions of the argument. In the first statement, the prosecutor is discussing the reasonable doubt

standard and discussing how that standard applies to the case. In other words, the prosecutor is attempting to state that the jury needed to believe that "no one else" had committed the offenses in order to find him guilty beyond a reasonable doubt. In the second and third statements, the prosecutor is in the process of indicating that if, after reviewing the testimony, evidence and applicable law, the jury believed Hopkins had committed the offenses, it would find him guilty. We do not read it, as urged by Hopkins, as telling the jury that they have no other choice regarding whether to convict or acquit.

{¶ 91} Hopkins next contends the prosecutor improperly stated:

It's kind of sad that she [Hopkins' mother] didn't even know he had a baby by another woman.

She got her times mixed up. I think she may have even got her dates mixed up.

{¶ 92} A review of the entire passage shows that the State was reviewing the testimony of Hopkins' mother, Deborah Crawford, and highlighting inconsistencies therein. For example, when she was interviewed by the police, Crawford indicated that Taylor had not been in her house on the day of the assault. Indeed, she indicated that she had not seen Taylor since October. She further denied to the police that Hopkins had any children, when he actually had a child by another woman.

{¶ 93} Conversely, during his police interrogation, Hopkins admitted that Taylor had been at the house and that she did not leave until approximately 7:00 p.m. Further, Crawford testified that she had seen Taylor at approximately 4:45 p.m. However, on cross-examination, Crawford indicated that she observed Taylor leave at 4:00 p.m. Crawford also testified that she was home from 4:45 until a repairman, who had arrived

to inspect the furnace, left the home at 6:45. Crawford testified that she then left the house again and did not return until midnight. We note that the repairman testified that he was in the home from 6:00 until only 6:15 p.m.

{¶ 94} We find that the State's comments were meant to highlight inconsistencies in Crawford's statement and testimony, and, thus, we cannot conclude that they constitute misconduct.

{¶ 95} The next statement to which Hopkins objects is, "[w]e know Chaenin was there. We know." He contends that the prosecutor was assuming the role of factfinder. However, this comment was made in the context of rebutting Crawford's testimony that Taylor had not been in the house on the day of the assault. Further, it is supported by Hopkins' own admission to the police, and by Crawford's trial testimony. Again, we find no misconduct.

{¶ 96} The next statement cited by Hopkins as constituting misconduct is related to Taylor's cellular telephone which police found under Hopkins' bed. The prosecutor stated, "[t]he phone, one of two ways it got under the bed. Right: Common sense. It either got knocked under there during the assault or he put it there to hide it. Those are the only two reasonable explanations." Hopkins contends that this statement assumes facts not in evidence, and that it is wrong because Taylor could have put it there. We note, however, that immediately after this sentence, the prosecutor indicated that the jury was free to find that there was no evidence as to how the phone ended up under the bed. Thus, we find no misconduct.

{¶ 97} Hopkins contends the State acted improperly by making the following statement during rebuttal closing: "The fact that he didn't chase her out of the house.

Again, lucky for her, I guess, that he didn't finish the job." We note that in closing, the defense attempted to argue that the evidence supported a finding that Taylor had not been assaulted by Hopkins, but had been hit by a vehicle after she left the Crawford home. As part of that argument, counsel stated that no one saw or heard the assault and no one observed Hopkins run out of the home after Taylor. The State's argument was made in reply to the defense argument, and we find no misconduct.

{¶ 98} Hopkins also objects to the prosecutor's statement that Taylor regretted going to see Hopkins the day of the assault. We find nothing improper with this statement.

{¶ 99} Next, Hopkins contends that the prosecutor acted improperly by stating that Taylor had no motive to lie about how she was injured. We find that this was not improper, as defense counsel argued that Taylor had lied about the assault.

{¶ 100} The last statement to which Hopkins objects is: "In the end, Tanner Devon Hopkins murdered his own daughter. One of the most defenseless, innocence [sic] victims you could ever have. And the last thing that London Taylor felt was pain. We know those injuries occurred while she was still alive, the hemorrhaging, the fractures, the trauma."

{¶ 101} We agree that there is no evidence in this record upon which to base the statement that the fetus felt pain. Thus, we agree that this statement is improper. However, based upon a reading of the entire closing argument, and given the competent, credible evidence presented by the State, we cannot say that it rises to the level of misconduct.

{¶ 102} We conclude that Hopkins has failed to demonstrate prosecutorial

misconduct.   Accordingly, the sixth assignment of error is overruled.

## VIII. Failure to Suppress Statements

{¶ 103} For his seventh assignment of error, Hopkins asserts the following:

THE TRIAL COURT ERRED IN FAILING TO SUPPRESS STATEMENTS RECEIVED FROM APPELLANT PURSUANT TO AN INVOLUNTARY WAIVER OF HIS CONSTITUTIONAL RIGHTS.

{¶ 104} Hopkins asserts that his statements made during a police interrogation should have been suppressed because he did not voluntarily waive his rights. Specifically, he claims that the only reason he waived his rights was because the detectives informed him that he was not a suspect, a fact that was not true.   He also claims that the detectives improperly continued the interrogation after he invoked his right to counsel.

{¶ 105} On January 14, 2015, Hopkins was arrested on an unrelated outstanding warrant.   He was taken to the Dayton Safety Building where he was interviewed by Dayton Police Detectives Nathan Via and Michael Deborde in relation to Taylor's assault. The interview, which was videotaped, began at 10:30 a.m. and ended at 12:35 p.m.   At the onset of the interview, Hopkins asked the detectives whether he was a suspect in the assault case.   He was told that he was not.   Because he was in custody, the detectives informed Hopkins of his rights under *Miranda*, and had him execute a pre-interview form which set forth those rights.   In the videotape, Hopkins states that he was familiar with his rights as he had been informed of his *Miranda* rights in relation to another case.   He further stated that he understood the form and the rights as stated by the detectives.

{¶ 106} After an hour, the detectives took a three minute break and provided water to Hopkins. During the next few minutes, the detectives informed Hopkins that they believed he assaulted Taylor. Hopkins then denied any involvement. At that point, Hopkins stated that, had he been informed he was a suspect, he would not have signed the pre-interview form and would have asked for a lawyer. However, he continued to speak with the detectives. At 11:59 a.m., they took a twenty-five minute break. The session resumed, and at 12:32 p.m., Hopkins stated, "I'm done talking to you, don't ask me sh*t." He then continued talking and denying culpability. In response, the detectives continued to state that they knew he was the person that assaulted Taylor. At 12:34 p.m., Hopkins stated, "If I needed a lawyer, I would have said it." At that point, the detectives asked whether he wanted a lawyer and he said, "yeah, I need a lawyer." The detectives then concluded the session and left the room at 12:35 p.m.

{¶ 107} The Fifth Amendment to the United States Constitution provides that no person shall be compelled to be a witness against himself. *State v. Western*, 2015-Ohio-627, 29 N.E.3d 245, ¶ 12 (2d Dist.). "In order to ensure that this right is protected, statements resulting from custodial interrogations are admissible only after a showing that the procedural safeguards described in *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), have been followed." *Id.* When making a determination regarding whether a valid waiver has occurred, we must "consider the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement." *State v. Edwards*, 49 Ohio St.2d 31, 358 N.E.2d 1051 (1976), paragraph two of the syllabus, *vacated on other*

*grounds*, *Edwards v. Ohio*, 438 U.S. 911, 98 S.Ct. 3147, 57 L.Ed.2d 1155 (1978).

**{¶ 108}** In ruling on a motion to suppress, the trial court "assumes the role of the trier of fact, and, as such, is in the best position to resolve questions of fact and evaluate the credibility of the witnesses." *State v. Retherford*, 93 Ohio App.3d 586, 592, 639 N.E.2d 498 (2d Dist. 1994). Thus, when an appellate court reviews a suppression decision, it must accept the trial court's findings of fact so long as they are supported by competent, credible evidence. *Id.* "Accepting those facts as true, we must independently determine as a matter of law, without deference to the trial court's conclusion, whether they meet the applicable legal standard." *Id.*

**{¶ 109}** Hopkins first claims that, because the detectives deceived him, his waiver of rights was not voluntary or knowing. However, this court has held that "use of deceit by the interrogating police officers and misrepresentations made to the suspect about the evidence police possess do not per se render a statement involuntary. Rather, deceit or a misrepresentation about the evidence is but one factor bearing on voluntariness." *State v. Reeves*, 2d Dist. Greene No. 2002-CA-9, 2002-Ohio-4810, ¶ 8.

**{¶ 110}** After reviewing the totality of the circumstances, we find no evidence that Hopkins' statements or the waiver of his rights were not made voluntarily. Hopkins reviewed the pre-interview form with the detectives, and he stated that he was familiar with his rights. He further agreed to waive these rights and signed a form memorializing that waiver. He indicated that he was aware that he was not required to waive his rights. This record does not establish that Hopkins' "will was overborne." This conclusion is especially compelling in light of the fact that Hopkins denied the allegations throughout the entire interview. Although the interrogation lasted for two hours, there was no

physical deprivation or mistreatment. Further, the detectives did not make any threats nor provide any inducements.

**{¶ 111}** Hopkins next claims that the police improperly continued to question him although he clearly invoked his right to an attorney. When a suspect requests counsel, the police must cease their interrogation until an attorney has been provided or the suspect himself reinitiates the conversation. *Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). However, a request for an attorney must be clear and unambiguous such that a reasonable police officer in the circumstances would understand the statement to be an invocation of the right to counsel. *Davis v. United States*, 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994). If a suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him." *Id.* at 461–62.

**{¶ 112}** The Supreme Court of Ohio has held that the statement "I think I need a lawyer" was not an unequivocal assertion of the right to counsel. *State v. Henness*, 79 Ohio St.3d 53, 63, 679 N.E.2d 686 (1997). This court has found the question "[d]o I need a lawyer[?]" to be ambiguous. *State v. Taylor*, 144 Ohio App. 3d 255, 260, 759 N.E.2d 1281 (2d Dist. 2001).

**{¶ 113}** Hopkins' statement that he would not have signed the pre-interview form and would have asked for an attorney is not, in our view, an assertion of the right to counsel. Moreover, when Hopkins did assert the right to counsel at the end of the two hours, it is clear that the detectives respected his rights and concluded the session. Thus, we find that the detectives did not improperly continue the interview after Hopkins asserted his right to counsel.

{¶ 114} We find that the trial court did not err in denying the motion to suppress. The seventh assignment of error is overruled.


## IX. Community Control Sanctions Revocation

{¶ 115} The eighth assignment of error asserted by Hopkins states:

THE TRIAL COURT ERRED IN FAILING TO HOLD A REVOCATION HEARING PRIOR TO IMPOSITION OF SENTENCE.

{¶ 116} Hopkins contends that the trial court should have held a revocation hearing with regard to whether he violated the terms of his probation in Montgomery County No. 2013-CR-2931, an unrelated case. Hopkins has not filed an appeal from that matter. Thus, that issue is not properly before us. Accordingly, the eighth assignment of error is overruled.


## X. Admission of Autopsy Photographs

{¶ 117} Hopkins' ninth assignment of error states:

THE TRIAL COURT ERRED IN ADMITTING GRUESOME, EMOTIONALLY INFLAMMATORY PHOTOGRAPHS OF THE DECEASED FETUS TO APPELLANT'S PREJUDICE.

{¶ 118} Hopkins asserts the trial court erred by admitting fourteen photographs (State's Exhibits 1 through 14) into evidence. He maintains that because there was sufficient medical and eyewitness testimony regarding the cause of the fetus's death, the photographs were not probative of the only remaining issue of "who and/or what cause [sic] the trauma." He further asserts the photographs improperly influenced the passions

of the jury.

{¶ 119} Under Evid.R. 403, the admission of photographs is left to the discretion of the trial court. *State v. Maurer*, 15 Ohio St.3d 239, 264, 473 N.E.2d 768 (1984). "[A] trial court may reject a photograph, otherwise admissible, due to its inflammatory nature if on balance the prejudice outweighs the relevant probative value." *Id.*

{¶ 120} In our view, the trial court properly admitted the autopsy photographs because they helped the jury to understand the coroner's testimony regarding the cause of the fetus's death. Further, the photographs were relevant and probative of the allegation that Hopkins caused that death by assaulting Taylor. The photographs were not repetitious. Exhibits 1, 2 and 3 are identifying pictures of the face, front and back of the fetus showing that no external injuries were found. The next three pictures, Exhibits 4, 5 and 6, depict different views of the placenta. The views were used to show blood clots, tears and a rupture, all of which were indicative of trauma. Exhibit 7 is a picture of the undersurface of the scalp showing an area of hemorrhage indicating that the fetus was alive at the time the injury was inflicted. Exhibit 8 shows the left side of the skull while Exhibit 9 shows the right side. Both depict separate skull fractures. Exhibit 10 is a picture of the fractures with a membrane removed therefrom. Exhibit 11 is a picture of the right and left fractures after the bones were cleaned. The pictures all demonstrate that the head suffered crushing injuries from a "very significant force." Exhibit 12 is a picture of the surface of the fetal brain which demonstrates a collection of blood indicative of blunt force trauma. Finally, Exhibits 13 and 14 are two different views of the fetal heart which show a heart defect. According to the coroner, the heart defect could have resulted in a heart murmur that would have been easily correctable but which might have

healed on its own before birth. The coroner testified that the defect would not have caused fetal death.

{¶ 121} There is no question that these images are unsettling, nor that an ordinary person would find it difficult to look at them. However, the probative value of the autopsy photographs is not substantially outweighed by the danger of unfair prejudice. As this court stated in *State v. Wade*, 2d Dist. Montgomery No. 21530, 2007-Ohio-1060, ¶ 35:

> Autopsy photos are inherently prejudicial when they depict gruesome, graphic wounds, but when offered to prove elements of the offense that the State has the burden of proving, they are usually not unfairly prejudicial. That is the case here.

{¶ 122} The ninth assignment of error is overruled.


## XI. Jury Pool

{¶ 123} Hopkins' tenth assignment of error is as follows:

THE TRIAL COURT ERRED IN FAILING TO PROVIDE A FAIR REPRESENTATIVE OF A CROSS SECTION OF THE COMMUNITY FROM THE JURY POOL RESULTING IN A VIOLATION OF THE APPELLANT'S RIGHT TO BE TRIED BY A CROSS SECTION OF THE COMMUNITY AND BY HIS PEERS.

{¶ 124} In this assignment of error, Hopkins claims that the jury pool "was comprised almost exclusively of white jurors." He argues that "for too long, there has been an underrepresentation of members of the African American community with young black men being tried by exclusively Caucasian juries." Thus, he contends that his rights

were violated.

{¶ 125} Hopkins' argument centers on his claim that few African–Americans were in the array of potential jurors. Crim.R. 24(F) permits a challenge to the array of petit jurors on the basis that it "was not selected, drawn or summoned in accordance with law." Crim.R. 24(F) requires that such challenges be made "before the examination of the jurors * * *." "In order to establish a violation of the fair representative cross-section of the community requirement for a petit jury array under the Sixth and Fourteenth Amendments to the United States Constitution, a defendant must prove: (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that the representation is due to systematic exclusion of the group in the jury-selection process." *State v. Fulton*, 57 Ohio St.3d 120, 566 N.E.2d 1195 (1991), paragraph two of the syllabus.

{¶ 126} Hopkins' challenge to the array was not brought to the attention of the trial court as it is raised for the first time on appeal. This court has denied such a challenge when, as in this case, the challenge is not timely made. *See State v. Walker*, 2d Dist. Clark No. 08-CA-32, 2009-Ohio-1936, ¶ 13; *State v. Curry*, 2d Dist. Greene No. 2012-CA-50, 2014-Ohio-3836, ¶ 30.

{¶ 127} Further, we find no error on this record. There is no information about the racial makeup of the jury pool other than Hopkins' claim that it was "almost exclusively" white and that only one African-American was seated. Further, there is no evidence in this record that would support a finding that there was systematic exclusion of African–Americans or that the potential jurors were not selected in accord with the law.

{¶ 128} The tenth assignment of error is overruled.

## XII. Cumulative Error

{¶ 129} The eleventh assignment of error states:

THE CUMULATIVE EFFECT OF THE FOREGOING ERRORS DENIED

THE APPELLANT A FAIR TRIAL.

{¶ 130} Hopkins contends that even if this court deems all of the foregoing claimed errors insufficient to merit reversal, the cumulative effect thereof mandates reversal.

{¶ 131} The Ohio Supreme Court recognized the doctrine of cumulative error in *State v. DeMarco*, 31 Ohio St.3d 191, 509 N.E.2d 1256 (1987). "Pursuant to this doctrine, a conviction will be reversed where the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial even though each of numerous instances of trial court error does not individually constitute cause for reversal." *State v. Garner*, 74 Ohio St.3d 49, 64, 656 N.E.2d 623 (1995). However, the doctrine does not apply unless there are "multiple instances of harmless error." *Id.* "In order to find cumulative error, we must find: (1) that multiple errors were committed at trial, and (2) there is a reasonable probability that the outcome of the trial would have been different but for the combination of the separately harmless errors." *State v. Goldblum*, 2d Dist. Montgomery No. 25851, 2014-Ohio-5068, ¶ 58, citing *State v. Kelly*, 2d Dist. Greene No. 2004–CA–20, 2005–Ohio–305, ¶ 33.

{¶ 132} Having found no errors, we can find no cumulative error. Accordingly, the eleventh assignment of error is overruled.

## XIII. Conclusion

**{¶ 133}** All of Hopkins' assignments of error are overruled, and the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

WELBAUM, P.J. and FROELICH, J., concur.

Copies mailed to:

Mathias H. Heck, Jr.
Meagan D. Woodall
Alan Gabel
Hon. Richard Skelton